Your Honor, Tom Monahan on behalf of Ryan Jensen. May it please the Court, respected counsel. Your Honors, once the police had taken Joe Paris into custody, it was unreasonable for them to continue to apply the extreme level of restraint that they continue to apply against Ryan Jensen. Counsel, educate me on something about that. My impression was, the criminal is on the lamp, and he has a gun, as far as they know. Two men come out of the room. They don't know which is which. The two men are going different ways. One of them runs down the stairs, the other one is apprehended. And the risk of your client takes place about the same time as them catching the other fella down the stairs. So it's not like they caught the criminal on the lamp, it was all done, they knew who was who. It's more simultaneous proceedings. Could you tell me, have I got that right, or have I got that wrong? And educate me. Your Honor, I think the Court respectfully does not have the chronology correctly. If the Court looks at the District Court's order on page 3, which is on page 195 of the excerpt of record, Judge Wingmill, which I think is the critical finding of fact in this case, noted that the question by Officer Perupski to Mr. Jensen occurred after, number one, they had identified Joe Parris, the police, and number two, after Joe Parris had already been taken into custody. Your Honor, it was not, there was never a specific time found by the District Court. However, it was made clear in the District Court's findings that one followed after the other. In other words, well, I think it was, it's not completely clear from the testimony or Judge Wingmill's findings, although I would just, of course, point out the government has the burden of establishing the validity of the stop, but I would note that they had time to take Parris to the ground, to search him, and then if the Court reviews the testimony, the police picked up Parris, walked him over to where Mr. Jensen was being held, and placed him down, Mr. Parris next to Mr. Jensen. All of that occurred, I'm not saying it was a terrible length of time, but all of that occurred before Officer Perupski moved on to finally ask about whether Mr. Jensen had any guns, knives, or I think the Court can reasonably conclude that it was a period of minutes before Officer Perupski actually asked the question to Mr. Jensen. And our position is, by that point — Well, they're both on the same floor. There was never any up or down. Your Honor, I think what may be confusing the Court is, the gentleman came out of the room, walked down the hallway, and there were three police officers — or excuse me, one officer on one end of the hallway and another on the other end of the hallway. Because of the concern for a crossfire, that other officer ran up the stairs, ran down the hallway, and came back down. So you're saying they were on the same level? Yes, they were. Now let me ask you a different question. Yes, Your Honor. All you need for a stop and frisk is reasonable suspicion. Yes, sir. Why isn't there enough reasonable suspicion to stop a person and ask them what's what? And if there's a concern about officer safety and frisking, just because he comes out of a motel room together with an armed criminal on the lam? Your Honor, I agree with the district court's conclusion that them leaving the motel room shows some connection, because clearly they came out of the same motel room. But I don't think it necessarily allowed the police to conclude an illegal connection. I would also note that — Wait a minute. They don't need probable cause for a stop and frisk. All they need is reasonable suspicion. I agree. And that's all I'm asking about. I understand. I would cite to Ybarra v. Illinois where the court there said you can detain — or excuse me, in subsequent cases like Mueller v. Mina, the Supreme Court has said you can detain someone until you get a handle on the situation or until the police fulfill their purpose. But Ybarra did not allow the police to go so far as a frisk. And I also cited a case following Mueller v. Mina out of the Tenth Circuit. It's Denver Justice and Peace Committee, I think it's called, where the Tenth Circuit said Mueller did not allow the police to conduct a frisk. These are very general propositions you're urging, and I happen to remember the Mueller v. Mina case very well, just by chance. Yes, sir. Facts have nothing to do with this case. Is there any case that's factually analogous, two men come out together, appear to be together, one of them's an armed criminal on the lam, and the question is whether there's reasonable suspicion that you could carry a stop on the other one? I haven't found a case directly on point, Your Honor, which is why I felt this was — See, I would have thought you catch an armed criminal on the lam, you can stop and frisk everybody with him. There's enough there to be suspicious. I simply don't think that that is contemplated by — Counsel, if what you're arguing is correct, the police should have released that man after they had taken the other man into custody without more. Here's a man carrying two guns and some drugs, so that the position of the police here is to make sure that it's absolutely certain. You should keep in mind that it's five in the morning, it is in a dimly lit hallway, there are other occupants in this building, and it seems to me incumbent upon the police to ascertain that this man can be released with complete safety, without danger either to the police or to the people living in that building. So in other words, the length of the detention and the means used to detain this defendant seems to me to be reasonable under the circumstances. Why aren't they? Your Honor, I think that up until the point where Parris was taken into custody, I freely concede the police didn't have — I'm talking after he was taken into custody. At that point, Your Honor, I think it was not reasonable for them to continue to use that level of restraint. Now, had they — I'm not saying the police had to just say, with respect to Mr. Jensen, but I think that they could have and should have begun the process of releasing him, letting him stand up, perhaps asking the question, do you have anything under those circumstances? But while you've still got them on his back, increasing the level of restraint, if you look at the record, they're actually making it more restrictive on Mr. Jensen after they've caught Mr. Parris. And, of course, the reason we know that they were doing that is Officer Perupsky was planning to transport Mr. Jensen to the — Parris Ranch. I'm sorry? Parris Ranch. So first they got him straight out of Parris. Correct. But I also think it's important to measure what Mr. Jensen did. The Terry case law makes it clear that we — My interest in that is really an aspect of Wren, the Wren case, where they said it really doesn't matter if it's a pretext. I read that a little more broadly. I mean, we don't really judge what the policemen say there. We judge what they did there. And what they did is either reasonable or unreasonable based on the objective circumstances. I think that the Wren case and the cases that were cited by the district court preclude the police from governing the analysis by saying, I had probable cause or I had reasonable suspicion. I agree with that. But I don't think that the district court had to completely ignore what Officer Perupsky's intent was, and here's why. The district court had to consider what the safety concerns to the police were at that point. And Officer Perupsky's statement, I think, reflects that they were not concerned at that point with Mr. Jensen being a threat at the time the question gets asked. But let's suppose that the cop said, I wanted to arrest him because he was wearing a flannel shirt. In my opinion, it's against the law to wear a flannel shirt. Just totally nonsensical. But there was perfectly good reason to arrest him because he found a gun, and there was good reason to stop. Wouldn't that be okay under Wren? I think that the statement can be considered because it shows a lack of concern for safety at that point by the police. And the courts do allow the police officers an opinion about whether there's a real safety concern to be considered. When the officer ---- It should not be. I mean, anybody who carries a gun for self-protection or keeps a gun in a desk drawer is going to use shot shells just so that they won't penetrate walls. If you're in a building with other people in it, gunshot will penetrate walls. Well, I also think the court has to look to how Mr. Jensen acted. In comparison to what Mr. Parris did, he distinguished himself from Mr. Parris by completely following what the police told him to do. And the case law still requires not just reasonable suspicion, but reasonable suspicion that the individual is armed and dangerous. And based on Mr. Jensen's failure to reach for anything, failure to do anything other than comply with the police commands, I think under those circumstances, they didn't have a reasonable suspicion that Mr. Jensen was armed, unless you bootstrap Mr. Parris's actions onto him, which Ybarra and his progeny say you can't do. And I've gone over. If I could have maybe a moment after for rebuttal. Thank you, sir. May it please the court and counsel, I'm Alan Burrow, Assistant U.S. Attorney with the U.S. Attorney's Office in Boise, Idaho. While I was not able to find a case that has these precise facts where two gentlemen walk out of a door at the same time, cited in the brief are three cases which are nevertheless analogous, where it is a person who is along with the person who the police are after ends up being detained and having a Terry Frisk. One of those cases is Allen v. City of Los Angeles. That's a spinoff case from the Rodney King case. Mr. Allen was a passenger in Rodney King's car. There were two passengers, Mr. Allen and one other. And, of course, when the police approached the car, they did with guns drawn. Mr. Allen was made to get out of the car. He complied with the police at every point. They had guns drawn. They ordered him out. They ordered him to lie on the ground. They handcuffed him. They frisked him. They ended up frisking him again. They made him stand up. They patted down the front of his body. They questioned him. A new officer arrived. They took off the old handcuffs, put on new handcuffs. They put him in a police car across the street. They questioned him again. And after about 24 minutes, they released him. And here, significantly, the cases, the court distinguished the cases which Mr. Jensen relies on here, the DelViso case, the DelGaudelio-Vazquez case, and the Ricardo D case, distinguished all of those cases on the grounds that there was no evidence in those cases of any safety concerns for the police that would justify the level of restraint used. Here, they pointed out and the court said that Mr. Allen is not responsible for what Rodney King did. That's true. But nevertheless, the police were responding to the situation as a whole, the court said, and their treatment of Mr. Allen cannot be analyzed in a vacuum. And they pointed out the fact that it was a high crime area, it was a car chase, it was at night, and Mr. King, the court said, was not compliant. Mr. Allen was compliant, but it was still relevant to the court that Mr. King was not compliant. For all of these reasons, the court said that the actions that the police officers took with regard to Mr. Allen were reasonable under the circumstances due to the various concerns and safety concerns and so forth. The Allen court cited and relied on an earlier Ninth Circuit case named Berry Hill, and that one is one where the police had a warrant for Mr. Berry Hill. And they found him driving in a car. So they pulled the car over, and Mr. Berry Hill and his wife are in the car. Well, they approach the car with guns drawn, they make Mr. Berry Hill get out, they arrest him immediately, but they have guns drawn on Mrs. Berry Hill as well. And the police do kind of a teary pat down of her, including of her purse, because she had her purse in her hands, and they end up finding no weapons, but they do find some evidence which incriminate her, and they end up arresting her. And there the court said that all companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the teary frisk and pat down procedures which are reasonably necessary to give assurance that they are unarmed. And they said teary extends to a criminal's companions at the time of arrest. And the Vaughn case said essentially the same thing. Now, Your Honor, no, I'm not urging that broad of a rule. What I'm saying is that in these cases they found that the specific circumstances were such where a companion, when a companion's in a car, when they're in the house, that's something I believe it was the Berry Hill case discussed, being present in those kind of contexts indicates some kind of an association between the two people. And if you have a situation where danger is presented or there's a chance of danger, then the principles of teary don't just go in isolation to the person who the police are initially focused on. They also extend to the person who is with that person. And I think under the circumstances of this case, here you don't have any of the normal factors that you would in a pretext case. This is not a traffic stop. Here the officers had no motive to go looking for evidence because they weren't investigating anything. They were simply trying to arrest Mr. Parris because there were warrants out on him. They were in a very dangerous situation. They're in a very public situation. They're in a hotel room. It's early in the morning. They've got all these other doors that open into the hallway. They don't know when some innocent, unsuspecting member of the public may walk out into that hallway. The police officers have no cover. They cannot post themselves at both ends of the hallway because of the crossfire issues, and they were waiting for more officers to come when they were surprised when Mr. Parris and Mr. Jensen came out into the hallway. Nobody fires a gun. Nobody has to walk out to get hit. I'm sorry, Your Honor? Let's go through the walls. Yes, Your Honor. Those are all concerns. In response to Judge Graber's question, are all innocent bystanders subject to a terror assault? Are you saying all innocent bystanders are subject to a terror assault if there's danger, or are you saying companions where there's danger? Companions, Your Honor, and it turns on the specific circumstances of each case. You know, some of the search warrant cases, for example, where they're going to have a warrant to search a particular house and there's people in the house and the courts say that the officers can detain these people. Right. To maintain the status quo and for safety reasons. Here, they clearly had safety concerns, and I would submit that the record, if you read the transcript. Yes, Your Honor? Your Honor, what information did the officers have regarding the violence that prevented the use of a criminal record of this person they were seeking to arrest? Did they have any information on that? Yes, Your Honor. They had information that there was one warrant that was outstanding for him and two other warrants that were in the works. One of those was for eluding a police officer and the other was for burglary, and he was reported to be armed and dangerous. Well, where did that information come from? That came during a police briefing at the beginning of their graveyard check, and then it came again when Officer Perebski called the... What was the source of it? I'm sorry? What was the source of it, that he's armed and dangerous? Who told the police that? I do not know the answer to that question, Your Honor. And I don't think the record, as far as I know, the record doesn't show that. Not internally manufactured to strengthen the problem or to justify any action that might be taken? No, Your Honor. There's no evidence of that. Anyway, unless the Court has any further questions. Thank you very much. Counsel, you ran out of your time. Go ahead and take three seconds. Thank you, Your Honor. I appreciate that. Thank you, sir. Just very quickly, I would just say the Berryhill case, Your Honor, was decided before Ybarra v. Illinois, and in U.S. v. Flippen, 962 F. Second, 163, this Court indicated that it may not well be still good law. The Vaughn case, also cited by my adversary, is distinguishable for two reasons. First, in that case, the purpose of the stop was not yet over. The police had not arrested the people in question before contacting Defendant Vaughn. Secondly, Vaughn, in that case, acted suspiciously. He had a bag. Twice he was told to stop, and he walked away both times, thereby giving reasonable suspicion that he could have been armed at that point. Mr. Jensen did nothing of the sort. In the Allen case, Your Honor, the defendant there was present during the commission of a crime by Rodney King. He was in a car while Rodney King rocketed through the streets of Los Angeles at speeds well over 100 miles an hour, whereas Mr. Jensen was never present at any time where the police observed Mr. Parris committing any kind of criminal activity. And I would just end by saying that at the time that Mr. Jensen was asked the critical question, five police officers were present. The level of restraint had been increased on him, not decreased, despite having no particularized suspicion against him. And for that reason, we believe that at that point he was under arrest without probable cause. Thank you for allowing this case to be argued, Your Honor. Thank you. United States v. Jensen is submitted.
judges: Kleinfeld, Graber, Rafeedie